BANK OF CALIFORNIA, N. A., v. AMERICAN FRUIT GROWERS, Inc.

No. 143.

District Court, E. D. Washington, N. D.

Nov. 19, 1941.

See, also, 37 F.Supp. 1017.

Bogle, Bogle & Gates, of Seattle, Wash., Crollard & O'Connor, of Wenatchee, Wash., and Ray Dumett, of Seattle, Wash. for plaintiff.

Kerr, McCord & Carey, of Seattle, Wash. for defendant.

SCHWELLENBACH, District Judge.

In this case the plaintiff contends that defendant converted the proceeds from certain sales of apples produced in 1937 on which plaintiff alleges it had a first lien by virtue of certain crop mortgages executed by some thirty-one fruit growers in

the Wenatchee Valley of the State of Washington. The plaintiff prays for an accounting and, after such accounting, judgment in the sum of $67,771.30 with interest.

The plaintiff is a national banking association with its principal place of business in San Francisco, California. It maintains a branch at Seattle, Washington. It was through this branch that the transactions herein involved were consummated.

The defendant is a corporation organized under the laws of the State of Delaware. It does business in many parts of the United States, and in the State of Washington it transacts business in Chelan County. During the time involved in this controversy defendant's business in that county consisted of the growing of apples and other fruit on orchards which it owned. During all of such times and up to December 20, 1937, defendant maintained an organization known as the Northwestern Fruit Exchange, a corporation (which was a wholly-owned subsidiary of defendant) which was engaged in the marketing of the products of the defendant and of other growers in the Wenatchee Valley. This corporation will hereafter be referred to as "The Exchange." The Exchange was dissolved on December 20, 1937, and all of its assets were taken over and all of its liabilities assumed by the defendant.

During the years 1930–1932, inclusive, the general depressed economic situation in the country was peculiarly disastrous in that portion of the State of Washington devoted almost exclusively to the production of apples and known as the Wenatchee-Okanogan region. The banks in the locality either failed or were in such precarious financial condition as to be unwilling or unable to furnish the necessary financing for the production of the fruit crops. Those engaged in all branches of the industry found it necessary to look to the Federal Government for financial assistance. As a consequence, early in 1932 the defendant, through its regional manager, Myron S. Foster, prevailed upon the railroad companies and power companies serving the district and upon the various cold storage and warehouse companies, both within and without the district, to join with it in financing the Columbia Agricultural Credit Corporation. This will be referred to hereafter as "Columbia." Capital in the amount of $200,000 was accumulated. Of this, the defendant furnished $25,600 through its subsidiary, The Exchange. The officers of The Exchange became the officers of Columbia. The office of Columbia was established in the building occupied by The Exchange and the defendant. The business of Columbia was transacted by the officers and employees of The Exchange who received no compensation for the work performed for Columbia. (After two years the treasurer of Columbia, who was also treasurer of The Exchange, was paid $50 per month by Columbia.) Shortly after its formation, arrangements were made by Columbia to secure a line of credit with the Reconstruction Finance Corporation during that year in the amount of $800,000.

In 1933, the Regional Agricultural Credit Corporation, another Federal agency, moved into the Wenatchee situation dealing directly with the growers and Columbia's credit with R.F.C. amounted only to $65,000.

Briefly, the R.F.C. deal was as follows:

Columbia took from the individual growers crop mortgages upon the entire crop to be produced by such growers during the year. From any lien creditors of such growers they took stand-by agreements in which such lien creditors agreed not to disturb the grower during the time during which the crop was produced and harvested and sold. Columbia and The Exchange entered into an agreement under the terms of which The Exchange was to market the crops, collect the proceeds, deduct its necessary selling expenses, advances, storage and freight and commissions and remit the balance to a depository designated by the R.F.C. The growers' notes and mortgages were deposited with R.F.C. along with the necessary endorsements and assignments. There was also deposited with R.F.C. the stand-by agreements above-described and a copy of the above-described agreement between Columbia and The Exchange, which I will hereafter refer to as "the agreement of May 23, 1932." The money of the R.F.C. was advanced upon the depositing with it of the above-described notes and mortgages. For the protection of the R.F.C. The Exchange was required each time that it withdrew apples from storage for sale and delivery to deposit with the R.F.C. a trust receipt. This was on a regular form prepared by the R.F.C. In effect, it provided that such apples were received by The Exchange in trust to be handled as provided in the agreement of May 23, 1932. This

agreement was referred to and by reference adopted as a part of the trust receipt.

So far as the record of this case discloses, the financing by R.F.C. and the use of that financing by Columbia and The Exchange was carried out to the satisfaction of all parties during the years 1932 and 1933.

During the spring of 1934 conversations commenced between the manager and assistant manager of the Seattle branch of the plaintiff and Mr. Foster and Mr. Schultz of the defendant concerning the possibility of the plaintiff taking over the financing which in the two previous years had been done by the R.F.C. Mr. Foster was then the regional manager for the defendant and the president of The Exchange and of Columbia. Mr. Schultz was treasurer of The Exchange and of Columbia. There is·some dispute as to which side originated the conversations. That, however, is unimportant as both sides appeared willing to arrive at some satisfactory understanding. For at least two years prior thereto the defendant and The Exchange had done a substantial portion of their banking business with the plaintiff. Substantial loans had been made by the plaintiff to the defendant. The relationship had been pleasant and profitable to both parties. For the year 1934, Mr. Foster and Mr. Schultz, treasurer of Columbia, estimated that Columbia would need a line of credit of $500,000. It is undisputed that Foster explained to plaintiff's officers the details of the requirements of R.F.C. It is undisputed that, insofar as the use of crop mortgages and stand-by agreements were concerned, the same method was to be pursued by the plaintiff bank. It is undisputed that Foster furnished to plaintiff the form of trust receipt which had been used with the R.F.C. and in which reference was made to the agreement of May 23, 1932. It was understood by all that The Exchange would market the crops produced as a result of the financing and that the marketing of those crops would result in sales and deliveries being made to the various persons and firms throughout the United States and in foreign countries. The bank officers not only knew that such marketing by The Exchange would result, but they testified that they insisted upon it. Unfortunately, no written agreement was entered into describing the rights and duties of the respective parties concerning the manner in which The Exchange was to apply the proceeds of the sales as between itself and its expenses, advances and commissions and the bank for the repayment of its loans. Had there been such an agreement, this lawsuit would not have been tried.

The bank officers both testified positively and directly that Foster and Schultz agreed that The Exchange would account to the bank for its advances before making any deductions on its own behalf. This agreement was denied by Foster and Schultz. They testified that it was understood that The Exchange could and should make its deductions first and then remit the balance to Columbia to the end that Columbia would repay to the bank the portion of such balances necessary to retire the loan of each individual grower involved. Foster and Schultz both testified that in explaining the R.F.C. terms to the bank officers they delivered to them not only forms of crop mortgages and stand-by agreements and trust receipts, but, also, a copy of the agreement of May 23, 1932, and a copy of the standard marketing contract which had been used between the shippers and The Exchange. The bank officers denied receiving either of these papers. Mr. Foster's testimony was that plaintiff's Seattle branch manager received the papers and pushed them aside with the statement that they were but typical government red tape and that they would do business upon the same basis as they had done it in the past.

After some discussion in which it was agreed that Columbia would reduce its request for a credit line from $500,000 to $350,000, plaintiff's Seattle officers made a report to the executive committee in San Francisco in which they recommended the loan. In that report, there was explained the relationship between Columbia and The Exchange and the defendant. Columbia's balance sheets as of April 10, 1933, and March 17, 1934, were included. The history of the organization of Columbia and its satisfactory relationship with R.F.C. were detailed. There was included a list of Columbia stockholders and their respective stockholdings. There was an explanation of the fact that Columbia would furnish over-riding collateral in the form of short term government securities in the amount of between $100,000 and $120,000. There was included with the report a copy of the trust receipt under which R.F.C. permitted The Exchange to withdraw apples from storage for market. Particular stress is laid upon the fact that at no time during the growing or harvesting season the total

loans would be more than double the amount of the over-riding collateral. There is no discussion in the report concerning the financial standing of the defendant or of The Exchange. Nor is there discussion upon the question as to whether or not The Exchange was to account first for possible balances due upon the loans or whether they were first entitled to withhold their expenses, advances and commissions. San Francisco approved the line of credit recommended with interest at 4½%.

With no further writing upon the subject except the notification that the line of credit had been granted and the filing by Columbia of the necessary borrowing resolutions, the financing of the crops of the various growers dealing with Columbia was commenced. During that year it was the practice for Columbia, from time to time, when it needed funds for financing to execute to plaintiff its own notes in amounts of $5,000, $10,000 and up to $25,000, and to forward to plaintiff such notes with growers' notes and assignments of crop mortgages in amounts approximating the amount of the master note executed by Columbia.

On August 19, 1934, there was deposited with the plaintiff in an account entitled "Northwestern Fruit Exchange Trustee Account," the first of The Exchange's returns from the sales of fruit financed by plaintiff, which fruit had been sold bill of lading with draft attached. That account was maintained throughout the years of the relationship between the plaintiff and Columbia and The Exchange. Withdrawals from the account were made regularly through the several years involved by checks to Columbia and The Exchange general account. Checks to The Exchange general account began September 11, 1934, and numbered 71. They amounted to a total of $206,150. They were in multiples of a thousand and they averaged around $3,000. Under this arrangement, the maximum amount loaned at any one time during 1934 was $239,000. The 1934 loan was paid in full on February 1, 1935.

The dealings between the parties during 1934 having been so satisfactory, naturally both parties were desirous of continuing the relationship during the 1935 season. The line of credit desired by Columbia in 1935 was $250,000. In view of that reduction in the line, it was proposed that the over-riding collateral should be only $50,-000. The report to San Francisco was practically a repetition of the 1934 report except that it included the April 25, 1935, balance sheet of Columbia. It was more confident in its terms due to the satisfactory financing of 1934 although it did point out that of the $113,000 shown on the balance sheet as notes receivable, $40,000 of that amount was of doubtful collectibility. Like the 1934 report, this one did not mention the financial responsibility of The Exchange or of the defendant nor did it discuss the question of the relative standing of repayments to the bank and reimbursement to The Exchange for its advances, expenses and commissions. There was nothing in the negotiations of 1935 which in any way changed the relationship between the parties. The $250,000 line of credit was approved by San Francisco with interest at 4½ per cent. and the financing was carried on during that year. The only change that occurred in the method of financing in 1935 was the elimination of the master notes executed by Columbia to the bank. That detail was eliminated and the bank simply took the growers' notes endorsed by Columbia along with the assignments of the mortgages. The maximum amount loaned in 1935 was not indicated in the testimony but, whatever it was, it was all repaid by April 29, 1936.

There is nothing which occurred either in the negotiations or the correspondence regarding the 1936 loans which is of any value in determining the issues in this case. The peak loan was $146,000. There was some pooling of shipments such as I will describe later but, by January 14, 1937, the loan had been repaid in full.

During the spring of 1937, Mr. Foster was in the East and Mr. Macklem, the assistant manager of the plaintiff's Seattle bank, was sick. As a result of these two facts, parties did not get around to making arrangements for the 1937 credit until June although $10,710.62 was loaned previous to June. When negotiations commenced that year Mr. Foster explained to plaintiff's manager that the Intermediate Credit Bank in Spokane had indicated its willingness to finance the 1937 crop at an interest rate of 2 per cent. Plaintiff's testimony on this point was that Foster stated that he was anxious to continue with the plaintiff even at a higher rate of interest than that obtainable in Spokane because he preferred doing business with a private financial institution rather than with the Government. Plaintiff's manager denied that Foster even told him of the details in-

volved in the possible Intermediate Credit Bank loan. Foster, on the other hand, testified that he had explained to plaintiff's manager that his objection to the Intermediate Credit Bank proposal was that that bank insisted that all returns be deposited in its designated depository and that it would make deductions for the repayment of its loans and the reimbursement to The Exchange. At any rate, an interest rate of 3 per cent. was agreed upon. On June 4, 1937, the Seattle branch of plaintiff recommended a $350,000 line of credit to its San Francisco main office. The report that year was much more detailed than had been the previous reports. In the meantime, Columbia had borrowed $50,000 from the R.F.C. as security for which it had pledged notes receivable in the amount of $82,000. Columbia had also increased its funded indebtedness by the issuance and sale of $26,500 worth of 4 per cent. debentures. It had been compelled to take in a fifty-acre orchard and packing shed which it carried on its books at $21,378. The report outlined in detail the proposal during 1937 that, insofar as it was possible, fruit would be sold under pooling arrangements so as to secure a more equal distribution of prices as between the various growers. It was also pointed out that it would not be possible that year to secure any over-riding collateral. The San Francisco office demurred to the making of the loan this year and pointed out to Seattle the reduction in the net worth of Columbia and the conversion of many of its quick assets into frozen assets. After further correspondence and discussion with Columbia, plaintiff's Seattle manager again recommended the loan on June 26 and it was approved in the amount of $300,000. In neither of these two 1937 reports was there anything to indicate that the plaintiff expected The Exchange to postpone its reimbursement until after plaintiff's loans had been repaid. Total loans in the peak amount of $313,000 were made.

The depression of 1937 brought about a collapse in the apple market. The returns from the sale of the apples were much smaller than had been anticipated and after The Exchange had reimbursed itself for all of its advances and commissions, it was found that, on April 19, 1938, Columbia was indebted to plaintiff in the amount of $106,941.74. On that date a demand note was given by Columbia to the plaintiff. Plaintiff retained the growers' notes and crop mortgages as security for this demand note.

During the months immediately succeeding, considerable correspondence passed between plaintiff and Mr. Foster. On two occasions plaintiff sent auditors to Wenatchee to check over the books of Columbia. There is nothing to indicate but that these auditors received the cooperation of Columbia and the defendant. On July 9, 1938, on the stationery of The Exchange, Mr. Foster wrote the plaintiff concerning the account of one of the growers named Gensinger and enclosed a memo which disclosed the deductions which The Exchange had made for its advances and its services. Both the manager and the assistant manager of the plaintiff testified that it was not until the receipt of this letter that they knew that The Exchange was making its deductions prior to remittances to the plaintiff in payment of previous loans. They both testified that up until that date they had always thought that the plaintiff got paid first and deductions were made after. Various payments were made on the account between that time and September 28, 1938, so that by that date the amount was reduced to $73,118.93.

On that date a suit was started in the Superior Court of the State of Washington for Chelan County by the plaintiff here against the defendant, American Fruit Growers, Inc., and also against Columbia, The Exchange and Foster and his wife. That suit was on the promissory note of April 19, 1938, so far as Columbia was concerned; against the other defendants, on the basis of conversion. There was no allegation in that complaint that the American Fruit Growers, Inc., or The Exchange ever agreed that payments would be made by The Exchange to the plaintiff prior to the deduction by The Exchange of sums for reimbursement and compensation. The case was tried in the State Court and a judgment rendered against all of the defendants in that case, except the Fosters, in the amount of $65,521.30. As to the Fosters, the case was dismissed.

That judgment was signed August 19, 1939. From that judgment an appeal was taken to the Supreme Court of the State of Washington by the American Fruit Growers, Inc., and The Exchange. The Supreme Court reversed the judgment as to those appellants on the ground of improper joinder of causes of action. 4 Wash. 2d 186, 103 P.2d 27. On September 13, 1940, acting on the remittitur from the Supreme Court, the Superior Court entered its judg-

ment in dismissing the action as to the two defendants. Thereafter, on the 8th day of October 1940, the pending action was commenced in the Superior Court of the State of Washington for Chelan County. On the 25th day of October, 1940, the cause was removed from the State Court to this court and the papers were filed here on the 28th day of November, 1940.

Plaintiff presents this case upon three theories:

1. The alleged agreement by The Exchange to pay Columbia and, through Columbia to pay the plaintiff for all returns prior to making deductions for its own advances and its own compensation.

2. Plaintiff contends that the corporate ties between the defendant, The Exchange and Columbia, and the control which defendant exercised through the use of identical officers and employees, makes the defendant liable for the obligations of Columbia.

3. That the defendant is liable as the successor to The Exchange, the liabilities of which it assumed, on the basis that The Exchange, with knowledge of plaintiff's prior lien, sold the property and converted the proceeds to its own use by deducting from such proceeds its own charges and advances.

■ As to plaintiff's first contention, I cannot accept plaintiff's version. On that point, there is a sharp conflict in the testimony with two highly reputable witnesses on either side testifying to exactly opposite stories. There was nothing in the demeanor of the witnesses on the stand which assists me in making the choice between them. However, the plaintiff must carry the burden of proof upon this point and it has not sustained that burden. Furthermore, it seems incredible to me that, if the plaintiff had such a valuable stipulation, that its officers would not have mentioned that fact in any of the reports to San Francisco. That was particularly true in 1937 when the San Francisco office was critical of the loan. In addition, if there had been such an agreement, it certainly would have been pleaded in the complaint in the Superior Court in 1938. I am forced to make the finding that no such agreement ever existed.

■ Again, I cannot accept plaintiff's contentions on its second theory. It is true that where business is transacted with various corporations, some of which are wholly-owned and some partly owned by one of the corporations, and where there are interlocking directorates and interchanging officers, the courts will zealously guard against any misuse of such corporate devices. The court will scrutinize more carefully transactions carried out through such media. However, the use of wholly-owned subsidiaries and mutual officers and directors is not malum per se.

■ The difficult problems in this case arise under plaintiff's third contention. It is that fact which has led me to discuss the facts as fully as I have. Since the matters involved in this case are not covered by the federal statutes nor by acts of Congress, the only authority governing the matters is the State of Washington. It has spoken concerning them through its Legislature and its Supreme Court. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487.

■ It cannot be doubted that plaintiff was possessed with a prior lien upon the crops herein involved as a result of the chattel mortgages properly executed to Columbia, by it duly recorded and assigned to plaintiff. Wash.Rem.Rev.Stats. §§ 3779, 3780.

■ The assignee of chattel mortgage, even though the assignee holds the mortgage as collateral security, possesses the same right as the mortgagee. Spokane Security Finance Co. v. Crowley Lumber Co., 150 Wash. 559, 274 P. 102, on re-hearing 152 Wash. 697, 279 P. 103; 14 C.J.S., Chattel Mortgages, p. 964, § 319; Vol. 10, American Jurisprudence, commencing at page 838, Secs. 185–189, inclusive.

■ The right of the mortgagee to sue in conversion the party converting the mortgaged property and to recover against the proceeds of such conversion has been repeatedly sustained. German-American State Bank v. Seattle Grain Co., 89 Wash. 376, 154 P. 443; Wenatchee Production Credit Association v. Pacific Fruit & Produce Co., 199 Wash. 651, 92 P.2d 883; Loudon v. Cooper, 3 Wash. 2d 229, 100 P.2d 42.

Any question as to the priority of a chattel mortgage properly executed, properly and timely filed, over subsequently acquired liens is foreclosed for this State. Rothweiler v. Winton Motor Car Co., 92 Wash. 215, 158 P. 737; Levitch v. Link, 95 Wash. 639, 164 P. 233; Beecher v. Thompson, 120 Wash. 520. 207 P. 1056, 29 A.L.R. 699; First Nat. Bank v. White-Dulany Co., 121

Wash. 386, 209 P. 861; Cashmere Valley Bank v. Pacific Fruit & Produce Co., 198 Wash. 363, 88 P.2d 579; In re Cascade Fixture Co. (Seattle Association of Credit Men v. Boersema et al.), Wash., 111 P.2d 991.

The date of the conversion is the date upon which the property is sold by the converter. Cashmere Valley Bank v. Pacific Fruit & Produce Co., supra; Loudon v. Cooper, supra.

The mere fact that one protected by a prior lien has knowledge that the property is being sold is not, in itself, sufficient to destroy the lien of his mortgage. Murphy v. Currie, 21 Wash. 232, 57 P. 795; Adams v. Harvey, 129 Wash. 483, 225 P. 407; Radford v. Washington Fruit & Produce Co., 175 Wash. 444, 27 P.2d 702; Cashmere Valley Bank v. Pacific Fruit & Produce Co., supra; Loudon v. Cooper, supra.

The cases just cited also hold that there is a presumption against the waiver of lien right which must be overcome by the person asserting the lien has been waived.

It is upon the foregoing decisions of the State Supreme Court that the plaintiff relies in this case. At the outset of its argument, defendant answers the foregoing arguments of the plaintiff by relying upon two Washington cases. The first is Jones v. North Pacific Fish & Oil Company, 42 Wash. 332, 84 P. 1122, 1123, 6 L.R.A., N.S., 940, 114 Am.St.Rep. 131. In this action there was involved the right of the mortgagee under a mortgage executed in Alaska under the provisions of the Alaska law to enforce that mortgage in the courts of the State of Washington after the property had been brought to the State of Washington with the mortgagee's consent. The court held against the mortgagee stating: "A mortgage duly executed and recorded in one state is given effect in another by virtue of the rule of comity that exists between the states, and applies only in cases where the removal is made without the knowledge or consent of the mortgagee."

That was all that that case did hold. Counsel for defendant vigorously insists that because, in its opinion, the State Supreme Court used the following language— "Consent by the mortgagee that the property may be taken from the situs of the mortgage is a waiver of the mortgage as against every person except the mortgagor"

—that I am compelled under Erie Railroad Co. v. Tompkins, supra, to accept that language and to recognize that as being the law of the State of Washington. It is undisputed here that the plaintiff consented to the removal of the mortgaged property outside of the State. However, the quotation upon which defendant relies is sheer obiter. It has never been followed by the State Supreme Court since. So far as I have been able to find, this precise language has never even been mentioned in any later State Supreme Court decision. I am satisfied that I am not compelled by Erie Railroad Co. v. Tompkins to accept isolated dicta as being the law of the State.

Defendant's second answer is based upon the case of Wenatchee Production Credit Association v. Pacific Fruit & Produce Co., 199 Wash. 651, 92 P.2d 883, 888. Here, again, the portions of the court's opinion upon which defendant relies were statements which were not necessary to the decision of the case and had no bearing upon the decision of the case. It is true, in that case, the claim of conversion was against a factor in a similar position to the defendant here and that it was made by the mortgagee in a similar position to the plaintiff. However, there were ample funds in the factor's hands to pay both its claim for advances and commissions and the balance due to the plaintiff under its mortgage. The question was whether the factor, after it had retained its advances and commissions, was entitled to withhold the remaining balance on another mortgage under which it claimed. The question of the retention by it of its advances and commissions was not in dispute. The mentioning of such retention in the opinion was only justifiable to explain the amounts involved. I have examined the briefs in this case. At no point therein do they discuss the right of the factor to retain its advances and commissions. Nobody was interested in that question because the mortgagee was amply covered by the additional funds over which the lawsuit was waged. Unfortunately, the court used the following language: "It is, of course, true that Pacific Fruit acquired a factor's lien on the 1936 crop when it was delivered to it to be marketed; but the record shows that all of its commissions and expenses of every kind and character, connected with the production and sale of that crop, were paid in full. Its factor's lien was, therefore, wholly discharged, unless it covered the $125,000

prior indebtedness. * * * We are of the opinion that the Pacific Fruit's factor's lien on the 1936 crop was limited to security for the commissions and expenses connected with the handling of that crop."

On the basis of that language, defendant contends that I am compelled to uphold its claim for a factor's lien here as against this plaintiff. I am convinced defendant is mistaken in that contention.

In deciding this phase of this case, my problem is to determine whether the facts of this case bring it within the various decisions of the Supreme Court to which I have referred. I must admit that plaintiff's counsel have most forcibly attempted to bring this case within the foregoing rules. However, I am persuaded that there is one fundamental difference between this case and all of the cases upon which plaintiff relies; that is, that in this case the plaintiff not only had knowledge that defendant was disposing of its fruit but it actively participated in causing the defendant to dispose of its fruit. Plaintiff's assistant manager, Mr. Macklem, testified that the bank had no facilities for marketing the fruit and that the bank insisted upon being assured that the marketing would be done by The Exchange. Plaintiff's manager, Mr. Wakeman, testified: "We were told from the beginning that they would be marketed by the Northwestern Fruit Exchange. We had known Mr. Foster for quite sometime and we knew the Northwestern Fruit Exchange and the American Fruit Growers. We thought that that should be agreeable to us because we had confidence in Mr. Foster and we thought that Northwestern Fruit Exchange would look after our interests."

On cross-examination, Mr. Wakeman testified further:

"Q. Now you, of course, knew as a result of your general experience as a banker in the State of Washington that Wenatchee apples are produced locally for shipment to distant markets outside of the State of Washington? A. That is right.

"Q. That if you did not ship them outside of the State of Washington, to the Eastern or Atlantic seaboard, or foreign markets, they would be worthless as a banking commodity? A. Practically speaking, yes, although sometimes the buyers bought them here as I understood it.

"Q. But the buyers buying them here buy them for export, don't they? A. Yes.

"Q. So ultimately they do go beyond the State of Washington? A. That is right.

"Q. And you were perfectly willing that the crops against which you were making loans should go beyond the State of Washington—outside of the State of Washington? A. We naturally supposed that they had to.

"Q. And some one had to pay freight to get them there? A. We knew that the freight had to be paid.

"Q. And you also knew that there were various other items that had to be paid in order to get the apples to any place where they would sell in order to get money to repay your loan? A. That is right.

"Q. And from the beginning it was your idea that each successive crop as it was produced, and packed, and ready for shipment, would be turned over to the Northwestern Fruit Exchange for shipment and sale in these distant markets? A. Turned over to the Northwestern Fruit Exchange for marketing purposes.

"Q. Yes. A. That was our understanding."

When, in 1934, there was handed to Mr. Wakeman a copy of the trust receipt used by R.F.C. in which reference was made to the agreement of May 23, 1932, and The Exchange was referred to as del credere factor, he must have known that The Exchange intended to deduct its advances and commissions. Both he and Mr. Macklem testified that they were experienced in the banking business and, as such, experienced in the financing of fruit crops. They knew that the 40¢ per box which they were to advance was less than half the amount required before the crops could be harvested, packed, stored and shipped and the money necessary for the repayment of their loan could be received from the ultimate purchaser located mostly upon the eastern seaboard and in the markets of Europe. I cannot conceive that they, as business men, believed that The Exchange was going to advance storage, freight and insurance and the various other items, which in most instances far exceeded the bank's advances, and take a chance on recovering its money after the bank's mortgage had been paid. It must be remembered that the only profit accruing to The Exchange was what remained out of its 10¢ a box commission after it had paid the proportion that these transactions bore to its total operating expenses. Furthermore, if that had been Mr.

Wakeman's understanding, it would have been an understanding of such an extraordinary deal that, in the course of the various reports over a period of four years, he would have mentioned the fact to the San Francisco Executive Committee.

In addition to that, commencing September 11, 1934, and throughout the dealings between the parties, plaintiff had in its bank The Exchange account on which withdrawals of returns from the sale of these crops were made simultaneously to Columbia and The Exchange. There were a total of 71 of these checks to The Exchange amounting to $206,150, averaging around $3,000. I cannot believe that the bank's officers were not aware of these simultaneous withdrawals. I know it is not the business of bank officers to be snooping through the accounts of their customers, but an account of this kind, where a portion of the money was to be used to repay the bank itself on its advances, was of such a nature that good banking practice would require the bank's officers to pay some attention to it. Mr. Wakeman and Mr. Macklem were competent bank officers.

I am compelled to make the finding that the marketing of these crops by The Exchange was at the request, and even the insistence, of the bank, and that the withdrawals by The Exchange were with the knowledge and consent of the bank.

The question then is whether these facts make it necessary to distinguish this case from the various cases upon which plaintiff relies. I think they do.

I fully recognize that mere silence, mere acquiescence, do not amount to such consent as would constitute a deferment of the mortgagee's claim to the claim of one who had made later advances or who had acquired a later lien. I recognize that the law requires a definite act before a lien can be waived. I doubt very much whether the State Supreme Court will again go as far as it went in De Boe v. Prentice Packing & Storage Company, 172 Wash. 514, 20 P.2d 1107, where the court said that the mortgagee was estopped to assert its mortgage lien because of its acquiescence in the actions of its mortgagor. In fact, I think that the inclination not to follow the De Boe case is evidenced by failure of the court to mention it since. However, throughout all of the cases there is a recognition by the court that a lien right may be deferred.

In Banning v. Livesley, 87 Wash. 580, 152 P. 4, plaintiff sued upon an alleged eloignment of hops upon which she claimed a landlord's lien. The only evidence in the case was that she consented to the sale of the hops by Livesley and accepted $1,000 of the money thus received as payment on the rent. The Supreme Court said this: "It cannot be questioned but that a landlord, who consents to the sale of a crop raised upon his land before the payment of the rent, waives his statutory lien, and that when the landlord consents to such sale, and receives part of its proceeds as rent with knowledge of the facts, it is a ratification of the sale, and the lien is lost."

Of further interest in this case is the following statement by the court concerning the plaintiff's position which was quite analogous to the position taken by the plaintiff here: "Appellant seeks to meet this testimony by saying that it was immaterial to her when, where, or for what price the hops were sold, so long as she received the money due her. This is probably true in one sense, but it is material in law when, in order to raise the money to pay the rent due, she consents to the sale. Under such circumstances she cannot claim her lien. This fact determines the issue. Robert Livesley, having purchased the hops with appellant's consent, if not at her request, and for her benefit, cannot now be held for eloignment."

In Wroten v. Robbins, 103 Wash. 393, 174 P. 968, 969, the court said this: "Agreements with respect to the manner of payment will not effect a waiver of the lien unless the terms agreed on are inconsistent with the existence or enforcement of the lien."

It seems to me that language in the Cashmere Valley Bank v. Pacific Fruit & Produce Co., supra, indicates that in that case the court recognized the difference between mere passive acquiescence upon the part of the mortgagee and a case such as this where the marketing of the goods was a result of the request and insistence of the mortgagee. In the Cashmere Valley Bank case [198 Wash. 363, 88 P.2d 580], the court outlined this as the question: "Can the converter deduct from the value of the chattel the converter's charges for preservation and preparation of the same for market when such preservation and preparation for market were done by the converter at the request of the *owner*

*Mortgagor* pursuant to a covenant in the chattel mortgage, of which covenant the converter had notice?" (Emphasis mine.)

There is nothing in that opinion to indicate that the mortgagee in any way participated in the activity of the Pacific Fruit in the conversion of the crop. It is, however, of interest to note that, in that case, the bank conceded that the amount charged for storage should be retained by the Produce Company and that its objection was for deductions for spray material, packing, etc.

After a full study of all of the cases upon which both sides rely, I am convinced that Pacific Storage Warehouse & Distributing Co., Inc., v. Bjorklund, 188 Wash. 269, 62 P.2d 39, 40, is more nearly controlling than any cited by either counsel. In that case one Kraft had a properly executed mortgage upon certain personal property, including household furniture and automobile. The mortgage was duly executed and timely filed. Kraft was a non-resident of the state and his agent Heinz represented him. The mortgagors found it impossible to longer maintain their residence and business in the real property upon which the personal property was used. They took up with Kraft's agent the question as to what should be done with the chattels and, at the agent's request, caused them to be stored in plaintiff's warehouse. The Storage Company asserted its storage lien and Kraft asserted his chattel mortgage. The Supreme Court said: "Appellant further contends that the mortgage lien was superior to the storage lien, and a number of authorities are cited in connection with that contention. We do not discuss the cases cited because, upon examination, they are found to be not in point. They are cases in each of which the mortgagee was not consulted with reference to the services for which the subsequent lien was created. In the present case, the storage was had at the request of the mortgagee acting through his authorized agent."

It seems to me that, in order to uphold the plaintiff's position, it will be necessary to find that the Washington Supreme Court has required complete and positive authorization by the prior lienholder directing or authorizing the subsequent lienholder to repay itself for its advances and compensation before such subsequent lienholder can avoid being guilty of conversion. That is the only element lacking in this case. In my opinion, that element is not necessary under the Washington decisions. It is true that the plaintiff did not directly express its intention to first permit the reimbursement of the defendant. All of the surrounding facts and circumstances, however, convince me that such intent did exist. The acts of the parties were only consistent with such an intent.

"When one intends the facts to which the law attaches consequences, he must abide the consequences whether intended or not." Texas v. Florida, 306 U.S. 398, at page 425, 59 S.Ct. 563, at page 576, 830, 83 L.Ed. 817, 121 A.L.R. 1179.

I, therefore, must hold that as to those deductions, reimbursements and commissions which a factor in the position of The Exchange would ordinarily be expected to make that the plaintiff expected and intended that they should be made when the plaintiff insisted that The Exchange should market the crops covered by the plaintiff's mortgages.

The evidence discloses that, among the deductions made by The Exchange, were advertising costs in the amount of 4¢ a box. Two cents a box went to a so-called cooperative known as the Skookum Cooperative Association. One cent per box went to another so-called cooperative of cooperatives known as the Pacific Northwest Fruits Advertising Agency. One cent per box went to the State Apple Advertising Commission under the provisions of Chap. 195, Laws of Washington 1937. I don't believe that it can be said that plaintiff intended in 1934 to subordinate the lien of its mortgage to these particular charges. The function of a broker or factor is to sell the goods. It was for the performance of that function that the factor was entitled to deduct his 10¢ per box commission. There was nothing immoral in that practice established among the factors disposing of apple crops of carrying on advertising campaigns for which they should have paid and charging back the cost of such campaigns against the growers. There was nothing wrong about the fact that in 1937 the Washington State apple handlers prevailed upon the Legislature to make compulsory the payment of an additional sum (up to 6¢ a box) which they, in turn, forced back upon the growers. In deciding this case, I have decided it upon the question of intent. I think the officers of plaintiff bank should not be charged with knowledge of this practice in the apple industry in the State of Washington. The fact that the dealers and handlers caused the practice

to be legalized in 1937 does not change my opinion as to what was plaintiff's intent in 1934. I will enter judgment for the plaintiff in the amount of 4¢ per box for each box handled by The Exchange from the 1937 crop on which plaintiff had its mortgage.

In the prayer of its complaint, plaintiff asked for an accounting. Under the rule that the court will not allow an accounting until a case has been made out for it, I limited the testimony of the plaintiff as to the detailed transactions to those of two growers. Unity Orchard Company was selected as the grower with the largest volume and A. L. Sheldon was selected as the sample of the grower with smaller volume. I permitted testimony concerning details of their transactions. In the case of Unity, The Exchange, after making its deductions, transmitted to Columbia $47,101.59. It accounted to the plaintiff for $40,367, leaving a difference unaccounted for of $6,734.59. Of that amount, $1,984.95 is totally unexplained. Of the balance, $2,255.99 was paid out by Columbia to the defendant for moneys advanced by the defendant during the 1937 growing season for supplies, spray material, etc. I am satisfied that defendant must account to plaintiff for this sum. Clearly, if any other supply house had furnished these supplies to the grower and had claimed a lien therefor, Columbia would have declined to pay them on the ground that it was compelled to account to the plaintiff up to the amount due to the plaintiff upon its mortgage. It was only because of the corporate relationship between Columbia and the defendant that the defendant was enabled to be reimbursed for a charge which was clearly inferior to the claim of the plaintiff. It is in this field that the courts guard against misuse of intercorporate directorates and mutual officers. The defendant cannot be permitted to use its control over Columbia to take advantage of the plaintiff. I will enter judgment against the defendant in that amount.

The remaining $2,493.65 was paid by Columbia to Skookum Supply Co. Whether or not the defendant should be required to account to the plaintiff for that amount depends upon the relationship between the defendant and Skookum Supply Co. If the defendant had control over the Skookum Supply Co., of a similar nature to that of its control over Columbia and if the $2,493.65 could not be properly classified as deductible by The Exchange in its role as factor, then that sum would be in the same category as the $2,255.99.

Plaintiff complains that defendant owns a 50 per cent. interest in Columbia Ice & Storage Co. That fact, in itself, would not prevent The Exchange from making use of that particular storage company. The apples had to be stored some place and, if they were necessarily stored and the charges for storage were reasonable and approximated the charges which would be made by any other storage concern, then no liability in this case would attach as the result of the corporate relationship. The same ruling would apply to the Ninth Street Warehouse which was owned by the defendant. If plaintiff proves that the storage charges were unreasonably high, it can recover for the excess.

In the explanation of the Sheldon account, there was $1,950.57 which was unexplained. In other words, after The Exchanges' deductions, Columbia received $6,064.75 of which it applied $4,114.18 on the bank's mortgage. Using the same rules that I have outlined in reference to Unity Orchards, the Sheldon account and the accounts of all other growers will be subject to an accounting. Counsel in this case have cooperated so splendidly in simplifying the work so far as the facts are concerned that I anticipate no necessity for a regular accounting proceedings including the expense of a master. I have no doubt that it will be possible for the parties to agree upon a stipulation as to the facts involved in this branch of the case and, for that reason, I will withhold the order for an accounting for the present.

In its answer, defendant has certain affirmative defences, only the fifth and sixth of which need now be discussed.

The fifth affirmative defence is that of prior adjudication. The defendant contends that all of the issues in this case were determined and adjudicated in the State court. It will be noticed that a reversal of the case by the State Supreme Court is not upon the basis of the merits of the action but rather upon the basis of the improper joinder of the causes of action. Defendant's contention, however, is that since Foster and his wife were sued in the State court and since Foster was an officer of each of the corporations, that the dismissal as to him resulted in the dismissal of the corporation and an adjudication as

to the corporation. Defendant cites Doremus v. Root, 23 Wash. 710, 63 P. 572, 54 L.R.A. 649, and a long line of similar Washington State cases which held that a master could only be held liable on the theory of respondeat superior, judgment against the master is erroneous when the verdict exonerates the servant as being free from negligence. This case, however, was not presented to the State Supreme Court on the theory of respondeat superior.

In Doremus v. Root, supra, the act of negligence which gave rise to the injury and furnished the foundation for the action was an act committed by the servant with which the principal had nothing to do. The principal was liable not because of anything it did but simply because of the rule of law which holds the master responsible for the negligent acts of the servant while in pursuit of his master's business. In this case, the suit against the defendant Foster was a joint one in which they were each charged with conversion. The corporation might well be liable and the officer not be liable.

Defendant's sixth affirmative defence is that of the statute of limitations, it being the contention of defendant that the conversion occurred and the liability established more than three years prior to the commencement of this action. That contention is completely answered in Remington's Revised Statutes of Washington, Section 173, which reads: "If an action shall be commenced within the time prescribed therefor, and a judgment therein for the plaintiff be reversed on error or appeal, the plaintiff, or if he die and the cause of action survives, his heirs or representatives, may commence a new action within one year after reversal."